IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04cr261

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| | ) | |
| LEONARD LEE MORGAN | ) | |
| | ) | |

This matter comes before the Court on the defendant's Motion to Suppress Evidence seized pursuant to July 29, 2005 searches of his home and car. (Doc. No. 15)

The defendant in the instant case, Leonard Lee Morgan, was indicted on September 30, 2004 on charges of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm, in violation of 21 U.S.C. § 922(g)(1). (Doc. No. 1) The defendant filed a Motion to Suppress Evidence on June 3, 2005 (Doc. No. 15), arguing therein that the evidence obtained from his house and car was seized in violation of his Fourth and Fifth Amendment rights. Specifically, he argues that all evidence obtained from his house and car should be excluded from trial because: the police did not have consent to search or enter his residence; his confession both was coerced and obtained in violation of Miranda; and the search of his car was not a valid search incident to an arrest.

This Court held a suppression hearing on August 31, 2005, where it heard the testimony of Officers J. R. Wise and Shane Page, Thelma Morgan, and Jasmine Gaither. Having considered their testimony, as well as the information contained in the defendant's motion and the government's response (Doc. No. 19), the defendant's Motion to Suppress Evidence is denied.

# I. FINDINGS OF FACT

On July 29, 2005, Officers Robert J. Wise, Shane Robert Page, Tim Slater and Evaney Nesbit of the David 3 Street Drug Interdiction Unit conducted a "knock-and-talk" at 313 Keswick Avenue.[1] The officers were investigating two anonymous tips placed on the Charlotte-Mecklenburg vice hotline that identified the residence as a locus of drug sales. The first complaint was registered on April 12, 2005, the other on June 18, 2005. (TR. 18:7-8) One complaint specifically alleged drug buyers would knock on the window on the driveway-side of the house and request drugs from a resident. The alleged dealer would then come out of the house and deliver drugs. (TR. 4:22-25) The tip also advised that the suspect had an alias of "Skynard."[2] Attached to the complaint was an "Arrest Offender History" that identified the defendant, Leonard Lee Morgan. The "Arrest Offender History" is a document that accompanies any complaints involving a location at which someone has been previously arrested. (TR. 21:2-4) The purpose of the knock and talk was to inform the residents of the home of the tips and, potentially, to request permission to search the house.

When the officers arrived at 313 Keswick Avenue, Thelma Morgan, the defendant's mother, was sitting alone on the front porch (TR. 5:15-16) Officers Wise and Page approached Mrs. Morgan while Officers Nesbit and Slater remained at the bottom of the porch stairs. (TR. 21:19-21)

---

[1]A "knock and talk" has been defined as "a noncustodial procedure where the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence." United States v. Cruz, 838 F.Supp. 535, 537 (D.Utah 1993). The "knock and talk" tactic has been upheld as a manner of obtaining consent to search (see Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir. 2001)), even if no probable cause or reasonable suspicion exists to question the residents of a dwelling. United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001).

[2]Although the transcript reads "Skinner," it probably should read "Skynyrd." The defendant acknowledged this was his nickname while being processed at the police station. (TR. 40:1-3) Skynyrd is apparently a play off defendant's first name linking him to the singer Lynyrd Skynyrd.

Each officer was uniformed and carrying a firearm, although the weapons were not displayed. Officer Wise identified himself, informed Mrs. Morgan the police had received the two complaints, and asked her if she lived at the house. (TR. 5:18-6:4) Mrs. Morgan said that she owned the house, and that her two sons, Jasmine Gaither (her son's girlfriend and mother of his child), and her granddaughter also lived there. (TR. 6:18-22) When Mrs. Morgan explained that neither of her sons were home but Ms. Gaither was in the living room, (TR 6:24-7:2) Officer Wise asked if he could speak to Ms. Gaither. Mrs. Morgan responded "that's fine," stood-up, opened the door, and allowed the officers into the residence. (TR. 7:4-7)[3] All four officers entered the house. (TR. 52:25-53:2)

Officer Wise told Ms. Gaither that he was investigating complaints that drugs were being sold at the house from a side window by one particular male (TR. 7:18-24) 47:13-18), and asked if she knew anything about such activities. Ms. Gaither said she did not know "anything about that." (TR 7:25) Later, she told the officers that she was staying in a bedroom with the defendant, Leonard Lee Morgan. (TR 8:2-3; 47:17-19)

Officer Wise asked Ms. Gaither if she could show him the bedroom. (TR 8:3-2; 47:18-20) She agreed. Officers Wise and Page accompanied Ms. Gaither to the bedroom, which proved to be the same room identified in the complaint. (TR 8:16-21; 47:20-22)[4] Officer Wise then asked her if

---

[3]See also TR. 20:11-16; 42:24-43:1; 43:16-17. Officer Wise's testimony was corroborated by Officer Shane Page. See TR. 47:1-4; 54:9-15. Mrs. Morgan, during the hearing, testified *a contrario.* Specifically, she said "They wanted to search it. And that if I let them search it, it would be no problem. But if I didn't -- didn't let them search it, that someone would stay there while they got a warrant, and that my name would be put in and I could lose the house." (TR. 68:13-17) As a result of these alleged statements, Mrs. Morgan let them go and search the house.(TR 68: 21-69:12) Mrs. Morgan, however, also testified that "they weren't threatening" (TR 73:4) To the extent that Mrs. Morgan's testimony contradicts the testimony of Officer Wise, the Court finds that Officer Wise's testimony is more credible. Mrs. Morgan testified that she was upset that day, and so she went to her bedroom. She testified she could not remember whether she was in her bedroom or on her porch when her son came home; that the police took him "back there" but later testified that she knew her son came home because she saw him handcuffed. She testified that she could not recall whether the police asked to speak with Jasmine, or whether she held the door open for the police. She did admit that she told the police they could go in. None of this recitation is intended to reflect adversely on Mrs. Morgan but rather to indicate why the Court believes the officer's version is more credible.

[4]See also TR 8:16-17; 47:22-25.

there was "anything in the room that was illegal, that maybe [the defendant] had that wasn't hers."

(TR. 23:6-8) Ms. Gaither again denied any such knowledge. At no point did the officers ask to

search the room.

Soon thereafter the defendant arrived at the house. (TR 8:23-24; 48:24-25) Officer Wise

introduced himself and asked if this was the defendant's room. The defendant admitted as much.

(TR. 49:9) Wise described the drug complaints and advised the defendant that his room was the one

identified by the complaints, (TR 9:5-7; 49:8-9). He then asked if he could pat down the defendant

for purposes of officer safety. The defendant agreed. (TR 31:3-8)

Officer Wise explained to the Defendant that he could refuse to speak with the police. If he

did, however, the police could *apply* for a search warrant. (TR 7:14-8:1)[5] If they obtained a warrant,

the police were "going to look through every little area that drugs could be hidden" and things

could get "broken by mistake". (TR. 17:3) Specifically, Wise testified that told the defendant:

> Let me explain to you my different options at this point, because this could be
> either a very easy situation or it could be a very difficult and complex one....
> You can be man-to-man with me. We can look each other face-to-face, eye-to-
> eye. You tell me if you're involved in this. You have to tell me what's exactly
> in this room, what exactly is going on. Or you have the right to where -- to
> refuse to do that with me, and I would have to obtain or apply for a search
> warrant. And I'd have to come back with a crew of officers. And that the door
> would have to be smashed in, possibly, and then we'd have to go through the
> house and peel through, you know, different areas looking for drugs and items.
> And I told him with the elderly mother that lived there and the small child, that
> it's probably not a good situation, but it's his option, you know, what he wanted
> to do...And to -- because of the elderly female being there, and because of the
> small child being there, it's very disruptive; usually it upsets both the elderly
> and the young. And basically I was just trying to tell him-- explain to him--
> that if it was up to me, or it was my opinion, if I was in his shoes, I'd much
> have it go the more cooperative way instead of the other way.[6]

At that point, the defendant had not been Mirandized or placed under arrest. Nor could he

---

[5]See also TR. 38:12; 38:16-23; 63:24-64:2.
[6]TR. 9:10-11:4; 17:8-15; 49:11-50:1.

have been, according to Officer Wise. (TR. 9:6-9)

The defendant agreed to tell the officers where the drugs were located. Officer Wise testified he said, "Okay. That's fine. You know, I'll tell you where the stuff is at." (TR. 9:12-13) The defendant identified a jacket that contained cocaine base in his closet, from which a bag containing 8.2 grams of crack cocaine was recovered. (TR. 9: 15-22)

When the police asked if he had any other drugs, the defendant said he had marijuana in the dresser in his bedroom. A search of the defendant's dresser revealed a bag of marijuana, and a wallet containing the defendant's identification. Pursuant to further questions, the defendant directed the officers to a scale located in the kitchen area. (TR. 10:12-11:11)

Officer Wise next explained to the defendant that he needed know who at the house was involved with the drugs. Specifically, Officer Wise testified he told the defendant and Ms. Gaither:

> whoever is responsible if there's something here, we need to know who is responsible. And I guess, you know, if they are both responsible for it, then, yeah, I might have told them you both are going to jail, or one or the other or whoever is responsible would.

(TR 41:15-25)

Office Page testified:

> I would say...that's a responsibility of ours to notify somebody of that...And that if, in fact -- that those people are then responsible for determining whether or not it's an entire household responsible for that criminal activity or if it's just one person who could be a transient, could be a visitor. And clearly the implication- not just the implication but the explanation- is that they then determine whether or not they are going to hold the person who either obtains the voucher or the person who is responsible for the lease responsible for everything going on in there. So it's not just an implication but it's an explanation that if they are alone responsible, and maybe the person who owns the house or has the lease is not responsible in any way, then that's important information for us to include in our investigative report....And the ramifications are is that if they accept responsibility for it, then it might not come back on the entire household. Clearly that would be important, either for the magistrate who

is responsible for determining whether or not to terminate a voucher, or for the Charlotte Housing Authority when they pursue a conviction, clearly it's important for them to understand, again, one player in the house or an entire household that is engaged as co-conspirators.

(TR. 59:9-61:21)

Officer Wise handcuffed the defendant (TR. 28:7-8; 51:18-19) and orally Mirandized him. (50:16-51:2) The defended orally acknowledged his rights (TR. 12:24-18:3). He then admitted that the cocaine, marijuana, and scale were his and that no other resident had any connection to them. (TR 50:3-10; 51:12-14) When Officer Wise then inquired as to the amount of drugs he actually sells per day, the defendant said that he sold "five crack rocks, five dime rocks a day." (TR. 11:20-22) At no point during this exchange did the defendant refuse to answer any question. Nor did he ever request a lawyer. (TR. 13:18:25, 50:22-51:2)

As the police escorted the defendant out of the home, the defendant asked if he could give some car keys to Ms. Gaither. (TR 14:6-8)[7] Officer Wise asked the defendant if there was anything in the car that he needed to know about. The defendant said,"I have a gun in my trunk." (TR 14:10; 30:6-7) Officer Wise asked the defendant which vehicle contained the gun. The defendant reponded that the gun was in the trunk of a Chevy Lumina parked in the backyard. When Officer asked which key opened the trunk, the defendant handed Officer Wise his keys and showed him officer which key opened the trunk. Officer Slater opened the trunk, observing therein a .38 caliber revolver. (TR. 14:14-21).[8] The defendant later admitted he purchased the revolver for $125. (TR 16:7-8)

---

[7] See also TR. 29:10-14. Ms. Gaither, however, testified: "They walked down the hallway and walked into the kitchen. I was like, "Give me your keys so I can get in and out of the house with the kids or whatever... And when he was handing me the keys, a police officer, one of the tall ones, he snatched the keys he said, "Are these the car keys to the car that's in the back?" He was like, yeah. He took the keys, went in the back and searched the car." (TR 80:25) The undersigned had the opportunity to observe Officer Wise and Ms. Gaither and determines that Wise's testimony on this disputed point is more credible.
[8]According to Ms. Gaither, the car "wasn't working." (TR 82:12; 85:1)

The defendant was then transported to the Law Enforcement Center. According to police records, the knock-and-talk and subsequent arrest lasted 50 minutes. It began at approximately 7:15 p.m. and ended at 8:05 p.m. (TR 34:7-15)

Subsequent to his indictment, the defendant filed the instant motion requesting that the Court suppress from use at trial the following evidence: (1) his statements admitting that he possessed and sold drugs; (2) the drugs and the scale recovered from the defendant's home; and (3) the gun and his admissions related to it.

## II. ANALYSIS

The defendant argues that the entirety of the evidence should be suppressed for three reasons: first, the police officers allegedly told Thelma Morgan that she would lose her lease if she did not consent to a search. Thus, because the police officers did not have Mrs. Morgan's voluntary consent to search the house, any subsequent consent to search was also invalid because it was fruit of the original illegal entry. See United States v. Thomas, 955 F.2d 207, 211 (4th Cir.1991). Second, the police coerced the defendant's incriminating statements when: (1) before his arrest, the police allegedly threatened that if the defendant did not consent to a search, the officers would return immediately with a search warrant and tear the house apart; and (2) after he was arrested and Mirandized, the police allegedly told the defendant that if he did not reiterate his admissions, his girlfriend could be arrested and his mother may lose her lease. See United States v. Mendenhall, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). Third, the defendant argues that since his initial statements preceded the administration and his voluntary waiver of Miranda rights, those admissions are irrebuttably presumed involuntary, and any subsequent reiterations are likewise inadmissible. See Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion); Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct.

1285, 84 L.Ed.2d 222 (1985). The defendant also asserts that the seizure of the gun and his admissions relating to it were invalid because an arrest inside a house generally does not permit the police to search a vehicle outside the building, unless the search of that vehicle is related to the reasons for which a suspect is arrested. See e.g., United States. v. Kelly, 547 F.2d 82, 84 (8th Cir. 1977). The Court finds none of these arguments compelling.

**A.      Burden of Proof**

Because the police did not have probable cause to arrest the defendant or search his home without obtaining a warrant, the burden of proof is on the government to show at the suppression hearing that an exception to the probable cause requirement existed. United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994); cf. Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) (government has burden of proving exception to warrant requirement). Moreover, the Government bears the burden of proving by a preponderance of the evidence that any statements were knowingly voluntarily made (See Lego v. Twomey, 404 U.S. 477, 489, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972)), especially when the defendant is under arrest when the statements are made. See United States v. Cristobal, 293 F.3d 134 (4th. Cir. 2002).

**B.    Initial Entry into the home**

If the initial entry into the home is invalid, any subsequent search will be invalid because it is fruit of the original illegal entry. Thomas, 955 F.2d at 211. Thus, the initial issue is not whether Mrs. Morgan consented to a search of the house, but rather whether she consented to the officer's entry into the house. It is undisputed that Mrs. Morgan was in her bedroom when the issue of consent to search arose.

The government concedes that the anonymous tips, standing alone, do not provide probable cause for the search the house or the defendant's arrest. But this lack of probable cause is not

dispositive. Police are not prohibited from conducting *any* investigation pursuant to anonymous tips. Rather, "absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se...to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof--whether the questioner be a pollster, a salesman, or an officer of the law." United States v. Cephas, 254 F.3d at 492-494 (4th Cir. 2001) (citations omitted).

In the instant case, Officer Wise had been provided information that felonies were, allegedly, committed routinely at a specific residence by an identified individual. Since these sorts of complaints often turn out to be nugatory, and since there was no area from which the police could covertly surveil the residence, a direct approach, the "knock-and-talk," was chosen.

The Court finds that when Officer Wise approached Mrs. Morgan on the porch, she told him that her sons were not home but Jasmine Gaither was inside the house. When Officer Wise asked to speak with Ms. Gaither, Mrs. Morgan said "fine", stood up, opened the door and invited them in. There is no credible evidence that Mrs. Morgan's allowing the officers to enter the home was anything but a voluntary act. There was nothing coercive about the officer's request.

**C.     Admissibility of Defendant's Pre-Arrest and Post-Arrest Admissions**

To be admissible, a suspect's statement must be voluntary. Haynes v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). And any statement given freely, voluntarily, and without any compelling influences is admissible in evidence. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Whether an admission is voluntary or induced by duress or coercion is to be determined from the totality of the circumstances, including the setting in which the statement was obtained, details of the interrogation, and characteristics of the accused. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Carroll, 710

F.2d 164, 167 (4th Cir.). However, while "coercive police activity is a necessary predicate to the finding that a confession is not voluntary... [t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity ... does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired...courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Braxton, 112 F.3d, 780-781 (4th Cir. 1997) (citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986))(internal quotation marks omitted).

Furthermore, once a defendant has been arrested, any alleged waiver of his Miranda rights must be knowingly and voluntarily made. United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002). In other words, the defendant must have understood he had the right to remain silent and that anything he said could be used as evidence against him, and then voluntarily chose to forfeit those rights. See Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).[9]

---

[9]In the instant case, the defendant does not argue that his waiver of Miranda rights was not knowing or intelligent, only coerced. See United States v. Cristobal, 293 F.3d 134 (4th Cir. 2002). Nonetheless, the Court finds that, based on the testimony offered at the suppression hearing, the defendant was informed of his Miranda rights; was aware he had the right to remain silent, and that anything he said could be used as evidence against him; and he knowingly chose to relinquish those rights when he admitted to possessing and selling drugs, as well as possessing the gun subsequently found in the trunk of his car.

**1.      Pre-Arrest Admissions**


While statements that a warrant *will be obtained* has been considered coercive, this Court finds that Officer Wise's statements that he would *apply* for search warrant did not coerce the defendant's admissions. In cases where defendants have argued that their consent to search was coerced, courts have noted a distinction between statements by the police that a person "might as well consent" because a warrant could easily be obtained, and statements that the police would "attempt" to obtain a warrant or could "probably" obtain one.[10]  The former implies that a warrant will be issued as a matter of course, while the latter, which includes such statements as those made in the instant case by Officer Wise, more accurately reflect the necessity that a neutral magistrate make a judicial determination of probable cause before a warrant issues. Thus, the Court finds Wise's remarks were simply statements as to how the investigation could legally and properly proceed. That the defendant was confronted with a difficult choice does not render his admissions involuntary. Cf. United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir.1987).

This Court also finds that, under the circumstances at the defendant's home, the officer's mere suggestion that damage to the house may result from execution of a search warrant is also insufficient to render the defendant's statements involuntary. The officers acted in a non-threatening and professional manner. And they informed the defendant of his right to refuse consent. The defendant clearly understood his options in the instant case: he very well could have required the officers to obtain a search warrant. While Officer Wise did mention that sometimes things get broken by mistake, this "amounted (in rather strong terms) to no more than a

---

[10]See United States v. Boukater, 409 F.2d 537 (5th Cir. 1969); United States v. Savage, 459 F.2d 60 (5th Cir. 1972); but see United States v. Blakeney, 579 F. Supp. 1197 (D.D.C. 1983) (police insistence that warrant could be produced almost immediately coerced defendant's consent to search).

permissible promise to search the house thoroughly." United States. v. Wilkinson, 926 F.2d 22, 24-25 (1st Cir. 1991).[11]

### 2. Post-Arrest Statements

The defendant asserts that he was coerced into confessing because the police threatened to arrest his girlfriend and to report his mother to the Charlotte Housing Authority. However, a confession motivated by desire to extricate a friend or relative from a possible good-faith arrest is not involuntary. What renders a confession involuntary is not *any* threat or promise, but rather "a threat or promise of illegitimate action." United States v. Stewart, 353 F. Supp. 2d 703, 706 (2004) (citing United States v. Contreras-Del Toro, 892 F. Supp. 159, 160 (S.D. Tex. 1995)).[12] The officers no doubt confronted the defendant with a difficult choice, but that choice did not overbear his will. Under the circumstances present in the instant case, however, the defendant's post-arrest admissions of sole-possession were not involuntary merely because it may have been motivated by a desire to extricate his girlfriend from a possible arrest. Nor were they involuntary because the police advised him of their duty to report to the Charlotte Housing Authority any drug activity in the house. Neither created a circumstance that made the defendant unable to decide or to choose whether or not to agree to the search or admit responsibility. Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Thus, the defendant's will was not "overborne," in the sense of his having suffered a "critically impaired...capacity for

---

[11]See also See United States v. Long, 866 F.2d 402 (11th Cir.1989); United States v. Andrade, 925 F.Supp. 71 (D.Mass. 1996) (Officer's statements to the possibility of getting a search warrant to knock down her door and make the search did not vitiate consent); cf. Holtzen v. United States, 694 F.2d 1129, 1131 (8th Cir. 1982) (consent to search voluntary even where officers claimed to have warrant, and threatened to "tear apart" defendant's house); United States v. Green, 678 F.2d 81, 83-84 (8th Cir.) (consent to search voluntary where officers threatened "tear the house apart" if occupant did not turn over drugs and money), cert. denied, 459 U.S. 1016 (1982); but see United States v. Kampbell, 574 F.2d 962 (8th Cir. 1978) (consent coerced when defendant was told, after refusing to consent, that a search warrant would give the police "the authority to tear the paneling off the walls").

[12]See also, e.g., Allen v. McCotter, 804 F.2d 1362 (5th Cir.1986); United States v. Davis, 912 F.Supp. 245, 248 (S.D.Tex.1995), United States v. Bolin, 514 F.2d 554 (7th Cir. 1975) (threat to arrest girlfriend did vitiate defendant's consent).

self-determination." Id.

**D.      Sufficiency of Miranda Warnings**

The defendant also argues that the admissions made before he was Mirandized, and the evidence thereby uncovered should be suppressed. The facts in this case, however, do not demonstrate that the defendant's freedom of action was curtailed to such degree that he was functionally in custody. The defendant had not been placed under arrest before he made his initial statements. He was told that he could refuse to consent to any search. And he was in his own home, he was not handcuffed or otherwise restrained, and the police officers did not brandish their weapons in his presence during the questioning.  He was not forced to enter the room with the officers, and he was never told that he was not free to leave. And the encounter did not last more than a few minutes.  Thus, under the facts of the instant case, the Court finds that the defendant's statements made to officers prior to his arrest occurred, at the very most, during an investigatory stop similar to a Terry stop. Therefore the officers were not required to advise the defendant of his Miranda rights. See United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir.1995); United States v. Moore, 817 F.2d 1105, 1108 (4th Cir.1987).  And, as previously noted, based on the testimony proffered at the suppression hearing, after Mr. Morgan was arrested, he was properly Mirandized, and the defendant subsequently, voluntarily and knowingly waived his rights to remain silent or have an attorney present when he reiterated his earlier admissions.

**E.      Search of Car**

An arrest inside a house generally does not permit the police to search a vehicle outside the building, unless the search of that vehicle is related to the arrest of the suspect. See e.g., United States. v. Kelly, 547 F.2d 82 (8th Cir. 1977) (arrest of a suspect in a motel room furnished no basis for search of a vehicle parked outside the motel, since the vehicle clearly was not located in an

area within the suspect's immediate control) (citing <u>Chimel v. California</u>, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). In the instant case, the car was not mentioned in the drug complaints. Nor did the defendant admit that the car contained drugs. It was parked behind the defendant's house, on private property, and was inoperable. And it appears that the defendant's friends and family did not have access to the vehicle's trunk. Therefore, the defendant argues, since there was no evidence that the car contained evidence related to his arrest for drug possession, and there were no exigent circumstances, the gun and any statements relating to its possession should be suppressed.

However, the Court finds strong evidence that under the circumstances the defendant voluntarily and knowingly admitted to having the gun when he was asked by the police if there was anything in his car that they should know about. The defendant then voluntarily consented to the search when he directed the police to its location, handed an officer his keys, and told them which key opened the trunk. As such, the gun, and the statements related to it, were validly obtained.

### III. CONCLUSION

In conclusion, in light of the evidence presented, the Court finds: (1) that the police had permission to enter the house; (2) the defendant was not under arrest when he freely and voluntarily directed the police to the drugs and scale in the house; (3) the defendant voluntarily and knowingly confessed to possessing and selling drugs; and (4) and the evidence relating to the gun seized from the defendant's car was obtained pursuant to the defendant's consent.

It is therefore ordered that the defendant's Motion to Suppress Evidence (Doc. No. 15) is **HEREBY DENIED**.

**Signed: October 19, 2005**

Robert J. Conrad, Jr.
United States District Judge